HAROLD G. HOPPE 5049
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2300
Honolulu, HI  96813
Telephone:    (808) 528-1903
Facsimile:    (808) 531-3860

JOHN R. HILLSMAN        71220
McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA   94133
Telephone:    (415) 421-9292
Facsimile:    (415) 403-0202

Attorneys for Dennis Claypool,
Sheryl Claypool, Scott Claypool and Kristen Claypool

# UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| DENNIS CLAYPOOL, individually and as Guardian Ad Litem for KRISTEN CLAYPOOL, a minor, SHERYL CLAYPOOL, SCOTT CLAYPOOL, and KRISTEN CLAYPOOL,<br><br>            Plaintiffs,<br><br>      vs.<br><br>CAPTAIN ANDY'S SAILING, INC., BLUE DOLPHIN CHARTERS, LTD. and BLUE DOLPHIN DIVING, INC.,<br><br>            Defendants. | Civil No. CV04 00570 HG- BMK<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLAYPOOL PLAINTIFFS' MOTION FOR APPROVAL OF GOOD FAITH SETTLEMENT**<br><br>***IN CAMERA SUBMISSION FILED UNDER SEAL PURSUANT TO L.R. 10.2(f).*** |

MATTHEW ISHAM,  individually     ) CIVIL NO. CV04-00559 HG-BMK
and as Guardian ad Litem for      )
HAYDEN ISHAM, a minor;            )
ROXANNE BEST ISHAM,               )
                                  )
                Plaintiffs,       )
        vs.                       )
                                  )
BLUE DOLPHIN CHARTERS,            )
LTD. and BLUE DOLPHIN             )
DIVING, LTD., CAPTAIN             )
ANDY'S SAILING, INC.,             )
                                  )
                Defendants.       )

_____

IN THE MATTER OF THE              ) Civil No. CV05-00037 HG BMK
COMPLAINT OF BLUE DOLPHIN         )
CHARTERS, LTD. AND TERRY          )
DONNELLY, AS OWNERS OF            )
THE VESSEL M/V BLUE               )
DOLPHIN, O/N 1082212, FOR         )
EXONORATION FROM AND/OR           )
LIMITATION OF LIABILITY           )

_____

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   I.    THE ACCIDENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   II.   THE LAWSUITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   III.  THE SETTLEMENT NEGOTIATIONS . . . . . . . . . . . . . . . . . . . . . 7

   IV.  THE RULE 68 JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   I.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES
       THAT THE RULE 68 JUDGMENT HEREIN WAS OFFERED IN
       GOOD FAITH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.   THIS WAS A CASE OF *PER SE* VESSEL OWNER
          NEGLIGENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.   THE $1.2 MILLION STIPULATED JUDGMENT
          COMPRISES A REALISTIC APPROXIMATION OF THE
          CLAYPOOLS' TOTAL DAMAGES . . . . . . . . . . . . . . . . . . 15

          1.   DENNIS CLAYPOOL'S PERSONAL INJURY
              CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          2.   THE FAMILY'S LOSS OF CONSORTIUM
              CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          3.   THE FAMILY'S NIED CLAIMS . . . . . . . . . . . . . . . 24

      C.   THE CLAYPOOLS HAD A VERY STRONG CASE AND
          EVERY LIKELIHOOD OF SUCCESS . . . . . . . . . . . . . . . . 30

D.   THE LITIGATION PROMISED TO BE VERY
     EXPENSIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

E.   BDC'S RELATIVE DEGREE OF FAULT WAS
     OVERWHELMING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

F.   THE CONSIDERATION ACTUALLY PAID TO THE
     CLAYPOOLS WAS INSUFFICIENT . . . . . . . . . . . . . . . . . 32

G.   MARKEL'S REFUSAL TO DEFEND TERRY DONNELLY
     AND BDC THREATENED THEM WITH
     INSOLVENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

H.   FAR FROM COLLUDING WITH THE CLAYPOOLS, BDC
     OPPOSED PLAINTIFFS' CLAIM WITH EVERY LEGAL
     TOOL AVAILABLE TO IT . . . . . . . . . . . . . . . . . . . . . . . . . 33

I.   THERE IS NO EVIDENCE TO SUGGEST THAT THE RULE
     68 JUDGMENT WAS OFFERED FOR ANY REASONS
     OTHER THAN PROTECTING BDC FROM THE EFFECTS
     OF MARKELS REFUSAL TO DEFEND OR INDEMNIFY
     WHILE AFFORDING THE CLAYPOOLS AN
     OPPORTUNITY TO OBTAIN FULL
     COMPENSATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35



# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Catalina Cruises, Inc.,*
    137 F.3d 1422 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Chan v. Society Expeditions, Inc.,*
    39 F.3d 1398 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*Fawkner v. Atlantis Submarines, Ltd.,*
    135 F. Supp. 2d 1127 (D.Hawaii 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In the Matter of Pacific Adventures, Inc., etc.,*
    5 F. Supp. 874 (D.Haw. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kermarec v. Compagnie Generale Transatlantique,*
    358 U.S. 625 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Marine Sulphur Queen,*
    460 F.2d 89 (2nd Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 19

*Mathes v. The Clipper Fleet,*
    774 F.2d 980 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McDermott, Inc. v. AmClyde,*
    511 U.S. 202 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Miller v. Christopher*
    (9th Cir. 1989) 887 F.2d 902 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Nelsen v. Research Corp. v. University of Hawaii,*
    805 F. Supp. 837 (D. Hawaii 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Plaisance v. Texaco, Inc.,*
    937 F.2d 1004 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Reyes v. Vantage Steamship Co.,*
    609 F.2d 140 (5th Cir. 1980)(same) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Sea-Land Services, Inc., v. Gaudet,*
    414 U.S. 573 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sutton v. Earles,*
    26 F.3d 903 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*The Pennsylvania,*
    86 U.S. (19 Wall.) 125, 22 L. Ed. 148 (1873) . . . . . . . . . . . . . . . . . . . 14, 15

*Weber v. Pacific Indemnity Insurance Co.,*
    345 F. Supp. 2d 1139 (D.Haw., 2004) . . . . . . . . . . . . . . . . . . . 1, 2, 3, 4, 36

**STATE CASES**

*Arenson v. National Automobile & Casualty Co.,*
    48 Cal. 2d 528, 310 P.2d 961 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Isaacson v. California Insurance Guaranty Association,*
    44 Cal. 3d 775, 750 P.2d 297, 244 Cal. Rptr. 655 (1988) . . . . . . . . . . . . 35

*Polaroid Corp. v. Travelers Indemnity Co.,*
    414 Mass. 747, 610 N.E.2d 912 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Sentinel Insurance Co. v. First Insurance Co.,*
    76 Haw. 277 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Troyer v. Adams,*
    102 Haw. 399, 77 P.3d 83 (2003) . . . . . . . . . . . . . . . . . . 2, 3, 4, 12, 15, 16,
                                                 30, 31, 32, 33, 34

**FEDERAL STATUTES**

Fed.R.Civ.P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9

Fed.R.Civ.P. 68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Inland Rule 5, 33 U.S.C. § 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Inland Rule 7, 33 U.S.C. § 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Inland Rule 27, 33 U.S.C. § 2027(e)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## MISCELLANEOUS

Prosser, *Law of Torts*
    (4th ed., 1977) 328 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Prosser & Keeton on Torts*
    (5th ed., 1984) 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# INTRODUCTION

This motion is being brought jointly by Plaintiffs Dennis, Sheryl, Scott and Kristen Claypool ("the Claypools") and Defendant Blue Dolphin Charters, Ltd. ("BDC"). It asks for a post judgment finding similar to the one this Court made in *Weber v. Pacific Indemnity Insurance Co.,* 345 F.Supp.2d 1139 (D. Haw, 2004). Like this case, *Weber* involved a maritime personal injury, an extended mediation effort, and an insurance carrier who refused to participate in the eventual settlement. The carrier in this case, Markel International Insurance Co. Ltd. ("Markel"), refused either to defend or indemnify its insured BDC. See *Exhibit A.4 (May 25, 2005 letter from Bernard Rice to Terry Donnelly).* Although the carrier in *Weber,* Indemnity Insurance Company of North America ("IICNA"), actively defended its insured Econ-Adventures, it refused to make a settlement offer that Janet Weber could accept. This led to direct negotiations between Weber and Eco-Adventures.

As Judge King's opinion explained:

> After extended mediation efforts, rather than accept IICNA's settlement offers of the (declining) remaining policy limits; Weber negotiated directly with Eco-Adventures . . . to allow a stipulated judgment of $225,000 to enter against Eco-Adventures in exchange for an assignment by Eco-Adventures' bad faith rights as against IICNA. As part of the deal, Weber covenanted not to execute the stipulated $225,000 judgment against Eco-Adventures' and to drop attempts to pursue personal claims against Eco-Adventures' shareholders, officers or directors. The settlement process also included a finding or statement

on the record by a U.S. Magistrate Judge and the mediator, based upon their participation in the settlement discussion, that the settlement amount was a 'reasonable settlement' and 'within an appropriate range' for the facts of the case.

The Magistrate Judge who presided over the settlement discussions in *Weber* was the Hon. Barry M. Kurren. To quote Judge Kurren's finding in *Weber*:

> As far as my own assessment, based on my participation in the settlement discussions with the parties that I've had over quite some time, and further discussing this case with mediator Keith Hunter, I certainly conclude, and am of the opinion, that it's within the reasonable – it is within an appropriate range for purposes of settlement, and it would be therefore a reasonable settlement of the case. I can make that assessment.

345 F.Supp. at 1142, n. 3 (original brackets omitted). We are asking Magistrate Judge Kurren for a similarly based assessment in this case.

The mediation process in this case extended over several months, involved repeated chambers conferences, and was ultimately concluded over the phone after the undersigned had returned to the mainland. As a consequence, the Court did not get an opportunity to place its assessment of the parties' stipulated judgment on the record. That is why we brought this motion.

We have styled our motion on Hawaii's Act 300, HRS § 663-15.5, and *Troyer v. Adams,* 102 Haw. 399, 77 P.3d 83 (2003). Technically speaking, *Troyer,* Act 300, and Hawaii state law are inapplicable to an admiralty tort case like the one at bar. See

e.g. *In the Matter of Pacific Adventures, Inc., etc.*, 5 F.Supp. 874, 877 (D.Haw. 1998). We are only using *Troyer* and Act 300 because federal maritime law does not specify a particular approach to good faith determinations like the one this Court made in *Weber.* See e.g. *Miller v. Christopher*, 887 F.2d 902, 908 n. 2 (9th Cir. 1989) (improvising a good faith settlement test from California's so-called "*Tech-Bilt* standard" without deciding whether it was proper to impose such a standard under federal maritime law.)

Under the "totality of the circumstances" approach laid down in *Troyer*: "The determination of good faith is left to the discretion of the trial court, based on all relevant facts available at the time of the settlement[.]" 102 Haw. at 423, 77 P.3d at 107. In order to inform this discretion, "the trial court may consider the following factors to the extent that they are known at the time of the settlement:

(1)    the type of case and difficulty of proof at trial e.g., rear-end motor vehicle collision, medical malpractice, product liability etc.;

(2)    the realistic approximation of total damages that the plaintiff seeks;

(3)    the strength of the plaintiff's claim and the realistic likelihood of his or her success at trial;

(4)    the predicted expense of litigation;

(5)    the relative degree of fault of the settling tortfeasors;

(6)    the amount of consideration paid to settle the claims;

(7)    the insurance policy limits and solvency of the joint tortfeasors;

(8)    the relationship among the parties and whether it is conducive to collusion or wrongful conduct; and

(9)    any other evidence that the settlement is aimed at injuring the interests of a non-settling tortfeasor or motivated by other wrongful purpose."

*Id.* at 427.    If the Magistrate Judge applies those factors to this case in light of everything he learned during our extended settlement negotiations,[1] we are confident he will find that the Rule 68 judgment BDC offered the Claypools' falls within an appropriate settlement range.

## STATEMENT OF THE CASE

### I.    THE ACCIDENT

This litigation grew out of the frightful, July 20, 2004 scuba diving accident off Makol'e Reef, Kauai that maimed Dennis Claypool and Matthew Isham.  That accident occurred because the crew of the BDC tour boat *Blue Dolphin* conducted a

---

[1]     In this connection, it is important to note that *Troyer* rejected the "contention that the court's determination must be based on evidence admissible pursuant to the [Rules of Evidence]" on the ground that: "Such a rule would make little sense." 102 Haw. at 430.  Just as this Court did in *Weber*, a court employing the *Troyer* standards "may determine the good faith of a settlement based solely upon the arguments of counsel, based upon affidavits, depositions, and other discovery materials of record[.]" *Id.*

scuba tour in the busy waters off Makol'e without displaying the required dive flag or maintaining a proper look out. This was a black-letter violation of the Inland Rules of Navigation. Without any dive flags or topside lookouts to divert her, the 700-horsepower tour boat *Sprit of Kauai* charged unawares through the *Blue Dolphin's* scuba site and ran over both men. The *Spirit's* starboard propeller slashed Dennis Claypool's right forearm to the bone, shattered and displaced his right radius and ulna, and cut all the nerves, tendons and muscles that serve his right hand. Between the resulting medical expenses, the lifetime wage loss, the immediate terror and agony, and the chronic pain, suffering, inconvenience and disability, Dennis Claypool's case could have supported a multi-million dollar judgment all by itself.



x-ray taken of Dennis Claypool's shattered forearm on the afternoon of the accident

But Dennis Claypool was not the only person who's life was altered by this accident. Dennis' wife Sheryl, son Scott, and daughter Kristen had all accompanied

him to Makol'e. Each was in the water at the time of his accident. What happened to them that afternoon will affect each and every one of them for the rest of their lives.

## II.    THE LAWSUITS

Six separate lawsuits were filed in this Court on account of the subject accident – two personal injury actions (Nos. CV 04-0559 and CV 04-0570), two vessel owner limitation actions (Nos. CV 05-0017 and CV 05-0037), and two declaratory relief actions (Nos. CV 05-0673 and CV 05-0251). The Claypools were party to four of those six suits. They were the Plaintiffs in action No. CV 04-0570, and were named as Defendants in both limitation actions and the declaratory relief action filed by Markel (CV 05-0673).

The *Spirit of Kauai's* limitation action was dismissed after the Claypools, the Ishams, and Captain Andy's settled all of their claims against one another in the summer of 2005. The two personal injury suits were then reassigned to Judge Gillmor and set for a consolidated jury trial along with BDC's still pending limitation action. In anticipation of that April 16, 2006 trial, the Claypools and BDC filed cross motions against one another under Fed.R.Civ.P 56. The Claypools asked Judge Gillmor to dismiss BDC's limitation claim on the ground that the *M/V Blue Dolphin* was not carrying a proper dive flag at the start the accident voyage. BDC asked Judge



Gillmor to dismiss Sheryl, Scott and Kristen Claypool's claims for negligent infliction of emotional distress ("NIED") on the ground that those plaintiffs were not swimming in the "zone of danger." Both motions were argued on December 16, 2005. After Judge Gillmor observed that she would probably send the Claypools' NIED claims to the jury, and counsel for BDC admitted that the *Blue Dolphin* was not carrying the dive flag required by Inland Rule 27, the Court took both motions under submission and sent the parties to a specially scheduled settlement conference before Magistrate Judge Kurren. That conference began on December 19, 2005, and continued over the phone until February 7, 2006, when the Claypools accepted BDC's offer of judgment.

## III. THE NEGOTIATIONS

In order to assess the reasonableness of the stipulated judgment, one must know a little bit about the negotiations which produced it. The pace and direction of those negotiations were dictated by the coverage contentions of BDC's various carriers. BDC had a "commercial passenger liability" policy with the Great Lakes International Insurance Co. (Policy No. 8/658/47860). But that policy excluded "[l]iability to divers operating from the scheduled vessel, from the time they commence to leave the scheduled vessel, until they are safely back aboard." BDC conceded this exclusion in the declaration relief action and took the Great Lakes

policy off the table.

Fortunately BDC was also covered as an additional insured under the "professional liability" policies that Lexington and Markel issued to the *Blue Dolphin's* three certified dive instructors, Matt Isham (Lexington Policy No. 1323464), Eric Trout (Lexington Policy No. 1323464), and Megan Langley (Markel Policy No. SA 00336). Those policies contained no "in-water" exclusions and provided $3,000,000 of combined coverage. One of the reasons BDC manned its tour boats with certified dive instructors like Isham, Trout and Langley was to take advantage of this "insurance backup." *Exhibit A.5 (Donnelly Dep.)* at 53:2-20, 81:11-15. The other reason was to harness all the "extra expertise" those instructors brought to BDC's scuba tours. *Id.* But the conduct of those three instructors was anything but "expert" on the day of the accident.

After the *Blue Dolphin* tied up at Makol'e, each of her dive instructors accepted specific safety responsibilities for every passenger who went diving. *Id.* at 55:7-56:3. Isham was the "in-water" scuba instructor on July 20, 2004; his job was to shepherd Dennis Claypool and the other divers underwater. *Id.* at 55:16-20 and 57:19-22. Trout was the "in water lifeguard;" his job was to patrol the scuba site on a paddle board and watch out for approaching perils or surfacing divers. *Id.* at 55:20-23, 57:19-22, 86:10-87:20. Langley was the "onboard safety officer;" she was supposed

to monitor the scuba site from the deck of the *Blue Dolphin* and divert approaching vessels away from the area. *Id.* at 82:11-85:9 and 85:21-86:9. All three instructors were obliged to "make sure the dive flags [were] up." *Id.* at 78:2-15. This included raising a meter-high Alpha flag to the masthead and deploying a red-and-white "dive float" above the scuba site. *Id.* 78:16-20.

The Claypools were injured because Isham, Trout, and Langley failed to discharge these responsibilities. Not one of the *Blue Dolphin's* dive instructors raised an Alpha flag or deployed a dive float. Isham allowed Dennis Claypool to become separated from the rest of his scuba students. Trout failed to patrol the scuba site, and Langley not only failed to maintain a proper look from the deck of the *Blue Dolphin*, she literally turned her back on the scuba tour and did not spot the *Spirit* until after that vessel had run over Isham and Claypool. *Exhibit A.6 (Langley Dep.)* at 105:10-106:7. Each of these omissions was critical, but when all is said and done Megan Langley's may have been the worst.

Without an Alpha flag flying from the *Blue Dolphin's* masthead, or a red-and-white dive float sitting in the water, there were no visible signals to deter vessels from BDC's scuba site. That site lay to seaward of the Makol'e tour boat mooring. It was like a "highway" out there. *Exhibit A.20 (Mitic Dep)* at 23:6-13; *see also Exhibit A.21 (Donna Cook Dep)* at 13:21-14:18; *Exhibit A.5 (Donnelly Dep)* at 75:15-76:11.

Isham, Trout, and Langley all knew that vessels routinely motored through those waters on their way to the Na Pali Coast even when there were scuba tours in the water – it had happened "a lot of times" to all them while they were working as in-water instructors. *Id.* at 93:19-94:12; see also *Exhibit A.7* (*Trout Dep.* at 95:11-96:18); *Exhibit A.8* (*Isham Dep.*) at 63:14-64:5.

Since Trout and Langley both knew that vessels regularly motored through the *Blue Dolphin's* scuba site, even when BDC actually "had flags up," they likewise knew how important it was to spot, hail, and warn such vessels away. On the day of the accident, this was Langley's job. Isham couldn't spot approaching vessels from underwater, and Trout couldn't hail them from his low-lying paddle board. Langley was the only BDC employee who was in a position to have picked up a radio or a loudspeaker and warned the *Spirit's* crew that they were approaching an occupied scuba site. But Langley had her back to that hazard. Her failure to call or even sight the *Spirit* denied Dennis Claypool and his family their last, best chance to avoid this tragedy. Megan Langley's insurer, Markel, nonetheless refused to negotiate with the Claypools.

Matt Isham's carrier Lexington indemnified BDC for his proportionate share of the fault on June 15, 2005, when it offered up the full $1,000,000 limits of Isham's professional liability policy. See *Exhibit A.2* (*Isham Settlement*). The Claypools

accepted that offer on June 16, 2005, released Isham, and gave BDC a dollar-for-dollar credit for the entire $1,000,000 payment. *Id.* Six months later, after Markel declined to negotiate, BDC made each of the Claypools an offer of judgment under Fed.R.Civ.P. 68, over and above any settlement sums which had theretofore been paid, in the following individual amounts:

      (1)    $950,000 in favor of DENNIS CLAYPOOL;

      (2)    $650,000 in favor of SHERYL CLAYPOOL;

      (3)    $50,000 in favor of SCOTT CLAYPOOL, and;

      (4)    $50,000 in favor of KRISTEN CLAYPOOL.

See *Exhibit A.1 (Rule 68 Offer)*.

Although the provisions of Rule 68 only gave the Claypools 10 days to accept this offer, BDC extended that deadline to afford Lexington more time to negotiate a proper indemnity for Eric Trout's proportionate share of the fault. That extension paid off on February 7, 2006, when Lexington agreed to provide the Claypools another $500,000 under Trout's policy. *Exhibit A.3 (Trout Settlement)*. The Claypools then released Trout, accepted BDC's Rule 68 offer, and acknowledged Trout's $500,000 payment as partial satisfaction. *Exhibit A.2 (Isham Settlement)*.

## IV.  THE RULE 68 JUDGMENT

The Claypools accepted BDC's Rule 68 offer on February 7, 2006. Judgment

was entered on February 16, 2005 in the gross amount of $1,700,000. *Exhibit A.1.* After the $500,000 Trout settlement was netted out, BDC remained liable to the Claypools for the combined sum of $1,200,000. If the Court considers that combined sum under the factors listed in *Troyer,* Your Honor will see that it falls within a range that is appropriate for the facts of this case.

## ARGUMENT

### I. THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT THE RULE 68 JUDGMENT HEREIN WAS OFFERED IN GOOD FAITH

After Lexington had indemnified BDC for Isham's and Trout's negligence, it asked BDC for leave to withdraw from the case. But this BDC on the horns of a painful dilemma. It was still exposed to the Claypools for Langley's proportionate share of the fault, but Langley's carrier Markel was refusing to defend it. The Rule 68 judgment was a perfectly reasonable means of escaping that dilemma.

### A. THIS WAS A CASE OF *PER SE* VESSEL OWNER NEGLIGENCE

If the Court follows the 9-part analysis spelled out in *Troyer*, it will start by considering "the type of case and difficulty of proof at trial e.g., rear-end motor vehicle collision, medical malpractice, product liability etc." 102 Haw. at 427. This was a case of vessel owner negligence involving *per se* liability.

A vessel owner like BDC owes passengers like the Claypools a general duty

---



of reasonable care under maritime law.    *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959).

> The degree of care required is always that which is reasonable, but the application of reasonable will of course change with the circumstances of each particular case.  The Second Circuit has described the standard accurately:

> What is required . . . is merely the conduct of the reasonable man of ordinary prudence under the circumstances, and the greater danger, or the greater responsibility, is merely one of the circumstances, demanding only an increased amount of care.

*In re Catalina Cruises, Inc.*, 137 F.3d 1422, 1425 (9th Cir. 1998) (internal quotation marks omitted).  Given the extreme danger that passing vessels posed to the *Blue Dolphin's* scuba-diving passengers – a danger that Langley, Trout and Isham had all experienced first hand  –  BDC should have exercised the highest possible degree of care.  Instead, it not only ignored its own in-house rules about dive flags, dive floats, and lookouts, it violated the Inland Rules of Navigation.

In a nutshell, the *Blue Dolphin's* crew:

(1)    violated Inland Rule 27, 33 U.S.C. § 2027(e)(ii), when they failed to display a "rigid replica of the international Code flag 'A'" not less than 1 meter in height" before putting anyone in the water at Makole;

(2)    violated Inland Rule 5, 33 U.S.C. § 2005, when they failed to "maintain a proper look-out" to spot and warn away any vessels approaching their scuba diving site;

(3)    violated Inland Rule 7, 33 U.S.C. § 2007, by failing to "use all available



means appropriate to the prevailing circumstances to determine if risk of collision exists," when they neither took a dive float out to the scuba site nor radioed the *Spirit of Kauai* to determine whether she intended to transit that site;

(4)     violated Hawaii State Ocean Recreation Management Area ("ORMA") regulation § 13-245-9(c) when they failed to display "a [red and white] diver's flag measuring not less than twenty inches by twenty inches" from "the highest point of the main structure" of the vessel, "in addition to the [blue and white] 'Alpha flag' required by the United States Coast Guard[;]"

(5)     violated the "Equipment Requirements" of the "General Standards and Procedures" of the *PADI Instructor's Manual*, (which TERRY DONNELLY had adopted as BLUE DOLPHIN'S in-house dive manual) when they failed to "use a dive flag where required by local law;"[2]

(6)     violated Rules 27 and 29 of the PADI Standards[3] when they failed to "[d]isplay a dive flag / diver-down flag any time passengers are in the water."[4]

These violations not only saddled BDC with *per se* liability, it invoked the "*Pennsylvania* Rule" and relieved the Claypools from the burden of establishing causation. *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed 148 (1873) (a vessel that has violated a Rule of Navigation must prove "not merely that her fault *might* not have been one of the causes the [accident], or that it *probably was not*, but that it *could not have possibly been*") ; see also *Mathes v. The Clipper Fleet*, 774 F.2d

---

[2]      See BLUE DOLPHIN'S Initial Disclosures, at 308.

[3]      *Id.* at 349.

[4]      *Id.* at 358.

980, 982 (9th Cir. 1985)(applying *Pennsylvania* Rule to personal injury case); *Reyes v. Vantage Steamship Co.*, 609 F.2d 140, 145-46 (5th Cir. 1980)(same). BDC would have had a very difficult time bearing this burden.

BDC threatened to argue that Dennis Claypool would not have been allowed to dive if his answers to a pre-dive health questionnaire had disclosed a "history of high blood pressure." Judge Gillmor scoffed at this argument during the summary judgment hearing and probably would have barred it under FRE 403 had the case gone to trial. Whatever BDC might pretend, Dennis Claypool did not have a "history of high blood pressure." He had a harmless case of "white-coat hypertension." *Exhibit A.13* (*May 2, 2005 Rule 26 Report of David A. Youngblood, M.D.*) at 2. To quote the Claypools' renowned undersea medical expert, Dr. Tom Neuman: "There is no question that he was physically qualified to participate in a Discover Diving experience and there is no question that had I evaluated him just prior to this incident, I would have found no reason to limit his diving." *Exhibit A.12* (*April 28, 2005 Rule 26 Report of Tom S. Neuman, M.D.*) at 4. Agreed his equally famous colleague, Dr. David Youngblood: "I would have cleared him to dive." *Exhibit A.13* at 2.

**B.     THE $1.2 MILLION STIPULATED JUDGMENT COMPRISES A REALISTIC APPROXIMATION OF THE CLAYPOOLS' TOTAL DAMAGES**

*Troyer* next invites a "realistic approximation of total damages that the plaintiff

seeks." 102 Haw. at 427. No realistic approximation of the Claypool's total damages can overlook the fact that the accident off Makol'e left them with *seven separate* tort claims: (1) Dennis Claypool's personal injury claim; (2) Sheryl Claypool's NIED claim; (3) Scott Claypool's NIED claim; (4) Kristen Claypool's NIED claim; (5) Sheryl Claypool's loss of consortium claim; (6) Scott Claypool's loss of consortium claim, and; (7) Kristen Claypool's loss of consortium claim. Had the case not settled, the Claypools probably could have amended their complaint to allege another count for punitive damages. *In re Marine Sulphur Queen*, 460 F.2d 89, 105 (2nd Cir. 1972) (allowing punitive damages in admiralty for gross negligence). $1,200,000 was a perfectly reasonable sum for settling all of those claims.

## 1.    DENNIS CLAYPOOL'S PERSONAL INJURY CLAIM



X-rays of Dennis Claypool's forearm taken after his first surgery on the day of the accident.

When Dennis Claypool and Matt Isham struggled back to the surface after their collision with the *Spirit of Kauai*, both men were literally awash in their own blood. *Exhibit A.9* (*Woolley Dep.*) at 128:3-4. The *Spirit's* captain and crew thought their wounds might prove fatal. *Exhibit A.9* (*Woolley Dep.*) at 33:7-9, 132:13-16, 137:24-138:7; see also *Exhibit A.10* (*O'Neill Dep.*) at 72:17-22, 76:7-77:8; *Exhibit A.11* (*Claypool Dep.*) at 109:11-18; *Exhibit A.9* (*Woolley Dep.*) at 128:18-129:20, 133:6-10, 135:14-21. It is thus easy to be dramatic about these injuries. But we will offer the muted evaluation of defense IME Robert Atkinson, M.D. instead:

> This 52-year-old right-handed male states his right arm was injured on July 20, 2004 when he was struck by the tour boat, The *Spirit of Kauai*, and sustained a serious injury to his right forearm with open fractures. He has had multiple surgical procedures and states that he is unable to supinate his right forearm (turn his palm toward the ceiling). He also complains of limitation of motion in his elbow and wrist and states that he feels a hardness or firmness in his proximal forearm which is intermittent. He states he was a person who used his hands for a lot of mechanical activities including mechanical repairs. He states he cannot use a wrench with his right arm and he has difficulty with twisting and turning activities using his right forearm or wrist.
>
> The patient has had multiple surgical procedures . . . . Surgeries include two surgeries in Hawaii on Kauai performed by Doctor David Rovinsky. This included internal fixation of his radius and ulnar fractures with subsequent re-doing [of] his internal fixation to improve his rotational alignment of the forearm fractures. The patient then was treated on the mainland [by Dr. Scott Duncan of the Mayo Clinic in Phoenix] and had tendon transfers performed for loss of radial nerve function. This tendon procedure was done in August 2004. Subsequently the patient underwent a right iliac crest bone grafting and application of an



implantable bone growth stimulator in March or April of 2005 for an unaudited shaft fracture.

*Exhibit A.14 (January 19, 2006 Report of Robert E. Atkinson, M.D.)*, at 1-2.

Summed up Dr. Atkinson: "The patient has significant functional loss of forearm supination, wrist range of motion and finger range of motion (in particular right ring and small finger flexion arc of motion)." *Id.* at 4. He will need regular medical follow-up for the rest of his life and is "a possible candidate" for yet a sixth surgical procedure to improve the rotational supination of his right forearm. *Id.* at 5. But Dr. Atkinson doesn't think this surgery will improve Dennis' condition. *Id.* He thus agrees that Dennis will never recover the use of his right, major hand. This has scarred the patient both physically and psychologically.

In the blunt language of the D.S.M., Dennis Claypool was "a psychologically unsophisticated, emotionally well-defended man with personality traits of narcissistic omnipotence, and exquisitely sensitive to anything which might puncture his high sense of self-worth; accordingly, when under stress, he may have to scramble to maintain self esteem." *Exhibit A.15 (February 6, 2006 Report of Martin Blinder, M.D.)* at 5. As renowned forensic psychiatrist Dr. Martin Blinder noted: "On July 20, 2004, Dennis Claypool suffered not only a debilitating physical injury but a significant narcissistic wound, challenging his long-held 'superman' image of

himself." *Id.* This wound left Dennis with a still unresolved "post-traumatic stress disorder" and a "major depression," both of which are severe enough "to warrant psychotherapeutic intervention." *Id.* Warns Dr. Blinder: "My greatest concern is a recrudescence of symptoms if, as is entirely possible, his defense mechanisms fail. *Id.*

Those defense mechanisms consist primarily "of denial of defects or problems." *Id.* But Dennis' residual symptoms are impossible to deny. The patient "continues to have muscle spasms and pain, sometimes two to three times a day. Parts of the limb are numb and cold, other parts hypersensitive." *Id.* at 3. "His other arm and hand are starting to give him problems as well due to overuse – doing the work of two arms." *Id.* These problems have profoundly battered the psyche of this once "handy" man. We have submitted affidavits from several people who know Dennis well in an attempt to describe this battering. See *Exhibit B* (*Declaration of Anna Lopez* ); *Exhibit C* (*Declaration of Jerry Porter*); *Exhibit D* (*Declaration of Jody Jeffrey*); *Exhibit E* (*Declaration of Susan Morse*); *Exhibit F* (*Declaration of Telly Rivenbaugh*): and *Exhibit G* (*Declaration of Russell Petrini*). Those affidavits all but use the term "superman" to describe him. Before this accident, Dennis' handiness and tireless do-it-yourself helpfulness were legendary. His family gave him a surprise birthday party at the local Home Depot, and his friends called him

"'Noah,'because he owned two of every tool ." *Exhibit G* (*Declaration of Russ Petrini*) at Par. 5. Whether the need arose at home, at church, at Sheryl's school, at Dennis' office, at one of the family's rental properties, or at a neighbor's house, Dennis was always there with the strength, the talent and the tools for the job. The accident changed all that. Today, Dennis' friends and neighbors have to help him. They don't mind a bit, but Dennis does. One of Dennis' friends put it this way:

> I helped home nurse Dennis immediately after his second surgery. I have also seen him in a variety of church and social settings since the accident. It is obvious to me that he still suffers a good deal of chronic pain and daily inconvenience because of his injuries. It is also obvious to me that he does everything he can to shield that pain from others, and to downplay that inconvenience whenever he can. I believe Dennis based a good deal of his self-image and self-esteem on his widely acknowledged handiness and helpfulness before this accident. I think the loss of those attributes has cost him more than any of us will ever know. Dennis was, and is, a great and good man, and it pains me to see him in this kind of distress.

*Exhibit D* (*Declaration of Jody Jeffery*) at Par. 3.

We could go on in this vein for quite some time, but it will suffice for our present purposes to say that, between his past medical expenses ($130,851.35),[5] his

---

[5]     See *Exhibit A.22* (*Medical Expense Summary*).

likely future medical expenses ($149,535),[6] his lifetime earnings loss ($604,190),[7] his

additional future rental maintenance expenses ($295,326),[8] and the overall loss of his

household services ($153,096), the present value of Dennis Claypool's total economic

loss (as calculated by Stanford-trained economics Ph.D. Patrick Kennedy) is

$1,202,147. See *Exhibit A.16 (Economic Evaluation of Patrick Kennedy, Ph.D.)*.

When all is said and done, we respectfully submit that these economic losses are the

*least* of Dennis' damages. After we have taken the potential general damage award

---

[6]        See *Exhibit A.23 (May 18, 2005 Medical-Legal Report of Dr. Scott Duncan)*.

[7]        Dennis Claypool was an insurance broker and a financial planner with the Prudential. He works on commission. By the time of the accident, his annual commissions were running as high as $135,000. Those commissions, in turn, flowed from his "book" of policies and the regular renewal earnings they produced. When Dennis was forced to leave Prudential for a year-and-a-half to convalesce from the effects of his injuries (and the 5 surgeries it has thus far taken to treat them) the policies in his book were "orphaned." See *Claypool Depo.* at 46:25-66:9. As Dennis explained at his deposition: "'Orphan' means I no longer am the agent of record. I don't get the renewals anymore. An orphan case is an employee worked there, built some clientele and quit the company, left and did something else. Now there is no agent or record and/or commissions paid to any agent for the maintaining of that record and servicing that record. So we call it an orphan." *Id.* at 59:15-22. Even if Dennis is ultimately able to return to Prudential full time, and this remains highly speculative, his forever orphaned accounts will cost him a great deal of income.

[8]        Before the accident, Dennis used to perform all the maintenance and repair work required by his rental properties himself. Today, he must hire it out.

---



into account, the appropriate verdict range[9] for Dennis Claypool's personal injury

_____

[9]

See e.g., MORIARTY vs. FITCH, ET AL. Docket No. L-081855-86, Verdict Date: December 21, 1989; Publication Date: Publication Date: March, 1990 Topic: Boating accident - Plaintiff water skier in water following detachment of tow line - Boat becomes entangled with rope pulling plaintiff's arm with extensive force - Destruction of most of soft tissue in arm - Extremely limited use of non-dominant arm and unusually extensive scarring Result: **$ 3,045,000 gross verdict**; JOSEPH M. NAYLOR vs. HAROLD GAMARSH, Case No. C-85-1789 Date: June 13, 1988; Publication Date: Publication Date: November, 1988; Topic: Negligent shooting - Liability and damages uncontested by defendant - Loss of use of right dominant arm - Lost earning capacity; Result: **$ 750,000 Verdict**; State: New Hampshire; MILLIAM V. NEW YORK CITY HEALTY 7 HOSPITALS CORP. Case No. 2471/81 Date: October 4, 1988; Topic: Medical Liability: Hospital Liable For Unnecessary Brain Biopsy RESULT:   Jury verdict awarding plaintiff **$ 1,000,000, consisting of $800,000 for pain and suffering, $175,000 for loss of earnings and $25,000 for loss of enjoyment of life**. INJURY: 40% loss of the motor and sensory functions of his left, dominant arm and hand; $175,000 loss of earnings. STATE:  New York; CARA SUHOSKI V. KIRK SBREGA, ET AL.Case No. WOCV200100480 Verdict Date: May 28, 2003 TOPIC: Motor Vehicle Auto Accident - Rear-end - Driver Falls Asleep At Wheel RESULT: **$ 700,000.** See Editor's Note. INJURY: Laceration to right triceps muscle in non-dominant arm severing two nerves and nearly severing the arm itself with significant pain and suffering. Plaintiff required surgery which resulted in an 11 inch scar on her arm. She claimed a 16% loss of function to her non-dominant arm and an 8% loss of sensation. She also fractured two front teeth requiring capping and bonding. She claimed $ 37,000 in medical expenses and no lost wages.  State: Massachusetts; KELLEY vs. SARCONA TRUCKING, INC.,Docket No. L-01423-98, Verdict Date: March 21, 2003; Publication Date: March, 2003; Topic: Failure to safely store docking plates in busy facility - Plaintiff truck driver trips, but breaks fall with his dominant arm - RSD to dominant arm and hand - inability to work; Result: **$ 2,300,000** Recovery; State: New Jersey; STACEY MILES vs. CITY OF CLEVELAND HEIGHTS; Verdict Date: Verdict Date: September 16, 1994; Publication Date: Publication Date: December, 1994; Topic: Police officer negligent in operation of police cruiser - Head-on collision with automobile operated by plaintiff tennis pro - Chronic soft tissue injury to left non-dominant arm - Liability admitted; Result: $ 1,000,000 verdict; State: Ohio; HAWKINS vs. 248 HAYNES ST.



claim is between $2,000,000 and $3,300,000.  Indeed, a jury verdict search confirms

that a $9,000,000 verdict might not have been out of reach.[10]

## 2.     THE FAMILY'S LOSS OF CONSORTIUM CLAIMS

Quite apart from Dennis' suit, his wife and children have their own personal

claims for loss of consortium.  It is well settled that "the beneficiaries of passengers

killed or injured on state territorial waters can recover such damages."  *Chan v.*

*Society Expeditions, Inc.*, 39 F.3d 1398, 1407-08 (9th Cir. 1994), 39 F.3d at 1407-08;

---

ASSOC., INC., ET AL.; Docket L-6793-91; Verdict Date: Verdict Date: April 26, 1994;Publication Date: May, 1994;Topic: Slip and fall outside of hotel lobby - Fractured wrist - Brachial plexus injury and thoracic outlet syndrome - Substantial loss of use of non-dominant arm; Result: **$ 1,500,000 verdict**; State: New Jersey; NEVINS vs. A & P.; Index No. 20375/84; Verdict Date: Verdict Date: June 2, 1989;Publication Date: Publication Date: October, 1989; Topic: Improper removal of snow from sidewalk abutting defendant supermarket - Fall on ice - Fractured elbow - Loss of 80% use of dominant arm - Inability to care for ailing husband and son; Result: $ 2,000,000 gross verdict; State: New York; AHLF v. JACKSON HEIGHTS HOSPITAL; Index No. 11026/97; Verdict Date: May 11, 2000; Publication Date: August, 2000; Topic: Medical malpractice - excessive force used during surgery to treat frozen shoulder  - severe brachial plexus injury - virtual loss of use of dominant arm and hand - continuing pain and hand tremor; Result: **$ 4,410,000 Verdict**; State: New York.

[10]        DALE MENDEZ V. BEAR MOUNTAIN, INC., Case No. RCV 40675 Verdict Date: November 5, 2001.  Publication Date: March, 2003 Topic: Skiing Accident - Plaintiff snow skier struck an improperly marked snow hydrant at the end of a jump and injured his left, non-dominant arm – Liability and damages contested by the defendant.  Result: **$9,865,668 consisting of $2,365,668 for economic damages and $7,500,000 for pain and suffering;** State: California.

---

see also *Sutton v. Earles*, 26 F.3d 903, 915 (9th Cir. 1994).  Sheryl, Scott and Kristen Claypool are thus entitled to compensation for the loss of "a broad range of mutual benefits each family member receives from the [other], including love, affection, care, attention, companionship, comfort, and protection."     *Sea-Land Servs., Inc., v. Gaudet*, 414 U.S. 573, 585 (1973).

The Claypools are a very close and loving family.  Sheryl is an elementary school teacher.  *Exhibit A.15 (February 6, 2006 Report of Martin Blinder, M.D.)* at 6.  Scott suffers from ADHD and is still living with his parents in Mesa.  *Id.* at 9. Kristen is a student at Arizona State and lives in the Tempe, Arizona home where her dad was raised.  *Id.* at 12.  Before this accident, Dennis was the mainstay for all of them.  *Id.* at 8, 10 and 13.  The help he lent his friends and neighbors was nothing compared to the love, attention, care, comfort, and protection he showered on his family.  *Id.*  In the wake of this accident, his family has to protect and care for Dennis. *Id.*  They are naturally pleased and proud to do so, but it has cost them all a great deal. Without putting too fine a point on it, we think Sheryl Claypool's loss of consortium claim could approach seven figures all by itself.

## 3.     THE FAMILY'S NIED CLAIMS

Because they were all present at the scene of the accident, Sheryl, Scott and Kristen are also entitled to compensation for the wrenching emotional distress they

suffered that day. See e.g., *Nelsen v. Research Corp. v. Univ. of Hawaii*, 805 F.Supp. 837, 849 (D. Hawaii 1992). BDC, of course, contested the Claypools' right to recover for that distress. Although Judge Gillmor did not actually rule on BDC's NIED arguments before the Claypools accepted the Rule 68 offer, Her Honor's suggestion at the summary judgment hearing that she would probably send the Claypools' claims to the jury was one of the reasons the parties were ultimately able to settle this case. Any realistic approximation of the Claypools' total damages should therefore include compensation for NIED.

The courts have confected four basic "tests" or "rules" or "standards" or "paradigms" for limiting NIED recovery: (1) the "physical impact" paradigm; (2) the "zone of danger" paradigm; (3) the "bystander proximity" paradigm, and (4) the "full recovery" paradigm. See e.g. *Plaisance v. Texaco, Inc.,* 937 F.2d 1004, 1009 (5th Cir. 1991). Those artificial paradigms all perform the same, simple function; they afford "a semblance of a guarantee" that the plaintiff's alleged mental injury is "genuine and severe." *Id.* at 1009 and fn. 6. "The Ninth Circuit has not adopted a specific threshold standard that must be met by plaintiffs bringing claims for NIED under general maritime law." *Fawkner v. Atlantis Submarines, Ltd.,* 135 F.Supp.2d 1127, 1134 (D.Hawaii 2001) citing *Chan*, 39 F.3d at 1409. But as this very Court explained in the oft' cited maritime case of *Nelsen v. Research Corp. v. Univ. of*



*Hawaii*: "In Hawaii the foreseeability standard applied to non-bystander mental stress cases is that a defendant can expect liability in a situation where a 'reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.' " 805 F.Supp. at 849. What is more, decisions from other maritime circuits make it clear that "one who has suffered a significant emotional injury should not be denied recovery simply because the factual scenario does not satisfy some earlier-selected, fictitious method of authenticating the injury." *Plaisance,* 937 F.2d at 1011. To quote Dean Prosser:

> It is entirely possible to allow recovery only upon satisfactory evidence and deny it when there is nothing to corroborate the claim, or to look for some guarantee of genuineness in the circumstances of the case. The problem is one of adequate proof, and it is not necessary to deny a remedy in all cases because some claims may be false. The very clear tendency of the recent cases is to refuse to admit incompetence to deal with such a problem, and to find some basis for redress in a proper case.

Prosser, *Law of Torts* (4th ed., 1977) 328 (compiling cases); see also Keeton, *Prosser & Keeton on Torts* (5th ed., 1984) 351. If anyone can present a proper case for emotional redress, it is Sheryl, Scott and Kristen Claypool.

Sheryl Claypool and her daughter Kristen were snorkeling within sight and sound of the accident when they heard Dennis scream: "Help, help, there is an emergency over here. We need help." *Exhibit A.17 (Declaration of Sheryl Claypool)* at Par. 5; *Exhibit A. 18 (Declaration of Kristen Claypool)* at Par. 2. They looked up

and saw Dennis and Isham floundering in the water a short distance away. *Exhibit A.17 (Declaration of Sheryl Claypool)* at Par. 5; *Exhibit A.18 (Declaration of Sheryl Claypool)* at Par. 2.

Scott Claypool was underwater at the moment of the accident, about 30-or-so feet beneath his dad. *Exhibit A.19 (Declaration of Scott Claypool)* at Par. 3. He surfaced in time to hear his father screaming. He swam over to discover Dennis' shattered forearm splayed open like a quartered blood orange, and waited in a daze alongside his dad as the *Spirit* circled back to pick them up. *Claypool Depo.* at 112:18-23, 180:21-181:6.

The Claypools detailed the horrors of that afternoon in their opposition to BDC's motion for partial summary judgment. See also *Exhibit A.9 (Woolley Dep.)* at 33:7-9, 128:18-129:20, 133:6-13, 135:14-21, 137:24-138:8;; *Exhibit A.10 (O'Neill Dep.)* at 72:17-22, 76:7-77:8, 78:13-79:25, 81:4-21, 90:3-91:4; *Exhibit A.11 (Claypool Dep.)* at 109:11-18, 111:12--112:12; *Exhibit A.17 (Declaration of Sheryl Claypool)*; *Exhibit A.18 (Declaration of Kristen Claypool)*; *Exhibit A.19 (Declaration of Scott Claypool)*. We won't belabor them here except to say that Dennis' maiming was a deeply distressing experience for the entire family.

According to Dr. Blinder:

In the months following the accident, Mrs. Claypool reports near



intractable insomnia which remained resistant to the antidepressants her doctor had given her for sleep. She had morbid ruminations about the event and its sequalae. 'The whole thing kept going over and over in my head. I couldn't stop thinking about it. Though the fundamental relationship she enjoyed with her husband remained strong, their once pleasurable sex life became something of a problem. 'I was always afraid I might hurt his arm.'

Though her husband seems to go out of his way to minimize his injury, she worries repeatedly about the ever-present risk of infection. 'The doctors told me an open sea wound is the worst kind you can have. There are little sea creatures that are in his arm forever. You never know when a terrible infection can flare up. And I worry about the future. He's always been so capable, always the one I and everyone else turned to. I fear what will happen when our roles are reversed. Right now it seems to me he is in denial, going out of his way to show everyone he's the same as before – sometimes to the neglect of his family.'

*Exhibit A.15 (February 6, 2006 Rule 26 Report of Martin Blinder, M.D.)* at 7-8. As the doctor summed up: "Mrs. Claypool has had quite a rough time of it, first not knowing if her husband had suffered a mortal wound, then being unable to help him, and finally, after his survival had been assured, not knowing what impact his injuries would have on him and their life together." *Id.* at 8.

Scott Claypool has also had quite a rough time.

Scott still feels badly that he didn't do more to help his father in the water. leaving him to cope with the emergency on his own. He continues to relive the accident in his waking hours, especially when he sees someone to the kinds of things his father used to do with ease but can no longer do. 'Sometimes I even have to button his shirt for him.'



Scott opines that he's still not there enough for his father who remains reluctant to ever ask for help. This can have adverse consequences. For example, he could tell that his father needed assistance but none was requested and Scott failed to offer any; as a result, his father struggled to manage on his own, fell, and struck his head.

*Id.* at 10.

Kristen has had a similar reaction. When she first heard her father screaming, she thought:

'Maybe my father might die. I was still not sure exactly what happened. A man told me my that my dad was okay but I thought he was just saying that to keep me calm. I didn't believe him. I felt so helpless. I'd been on the swim team and was a lifeguard. I should have gone to help him because I could have got to him fast. It was really frustrating not to be allowed to help your own father.'

\* \* \* \*

Since the accident, Kristen has developed a number of fears, sometimes rising to the threshold of a panic attack. A few weeks after her father's accident she was given an opportunity to go water skiing but found she was afraid to even get into the water. "And I get anxiety attacks whenever I'm around engines, like motorcycles. I'm afraid of heights now. I was never afraid of these things before, I shouldn't be, and I'm not thinking precisely of my dad's accident when I get these attacks but I never had anything like this until after he got hurt. My heart starts beating, I get these palpitations – just talking about it now I feel a little palpitation.' She also describes crying jags that come on for no reason, a 15 pound weight gain, and more painful menses.

There has been a personality change. 'Before the accident I was easygoing. Now I'm much harder on people. And I used to be very trusting. I think I was naive. I'm much less so. I know now what can

happen . . .'

*Id.*at 12-13.

Dr. Blinder diagnosed all of the Claypools with acute post traumatic stress disorder and chronic adjustment disorder. We think a jury would have compensated each and everyone of them for these emotional injuries.

### C.    THE CLAYPOOLS HAD A VERY STRONG CASE AND EVERY LIKELIHOOD OF SUCCESS



Digital image of the *M/V Blue Dolphin* (in the foreground) lying at Malol'e without a dive flag less than five minutes before the accident

The next factor a court should consider under *Troyer* is "the strength of the plaintiff's claim and the realistic likelihood of his or her success at trial." 102 Haw. at 427. To make these points again is to belabor them; the *Blue Dolphin's* crew not only failed to raise a dive flag, deploy a dive float, or maintain a proper lookout, they



literally turned their backs on the *Spirit of Kauai* as she churned through their scuba site. Had the case gone to trial, the Claypools would have moved for a directed verdict.

## D. THE LITIGATION PROMISED TO BE VERY EXPENSIVE

*Troyer* also instructs us to consider "the predicted expense of litigation." 102 Haw. at 427. This litigation would have been very expensive. The consolidated jury trial would have lasted three weeks or more. Had Judge Gillmor permitted defense BDC to argue that the accident might not have happened if Dennis Claypool had answered his PADI health questionnaire differently, the trial would have run even longer. Both sides would have called high-priced medical specialists to debate Dennis' pre-accident health history and his overall fitness to dive. The resulting expert fees would have consumed tens of thousands of dollars. And this would have been the *least* of the parties expenses.

Most of Dennis' treating surgeons and therapists live and practice in Phoenix, Arizona. So do most of the other damage witnesses. His accident was witnessed (and videoed) by vacationers who had come to Hawaii from as far away as Oregon, Illinois, Maryland, and France. The costs of preserving and presenting all that far-flung testimony would have been staggering.

### E.    BDC'S RELATIVE DEGREE OF FAULT WAS OVERWHELMING

The next *Troyer* factor is "the relative degree of fault of the settling tortfeasors." 102 Haw. at 427. This factor is particularly telling in a maritime tort case like this one.

General maritime law ordinarily holds concurrent tortfeasors jointly and severally liable, but when the parties enter into a piecemeal settlement, any non-settling defendants remain liable for their *full* proportionate share of the fault; they do not receive a *pro tanto,* dollar-for-dollar settlement credit. *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220 (1994). The amount the *Spirit of Kauai's* owners paid to settle this case is therefore irrelevant. *Id.* The question is whether the net $1,200,000 stipulated judgment represents a realistic assessment of BDC's relative degree of fault. It does. The relative culpability of the *Blue Dolphin's* crew was overwhelming. What is more, since Isham's carrier paid $1,000,000 for his proportionate share of the fault, see *Exhibit A.2* (*Isham Settlement*), and Trout's paid $500,000 for his share, see *Exhibit A.3* (*Trout Settlement*), $1,200,000 reflects Langley's (and therefore Markel's) unpaid share very accurately.

### F.    THE CONSIDERATION ACTUALLY PAID TO THE CLAYPOOLS WAS INSUFFICIENT

*Troyer* also queries "the amount of consideration paid to settle the claims."



102 Haw. at 427.    As we just saw, the amount Lexington paid to compensate the Claypools was never intended to cover Langley's share of the fault.  Since Markel refused to defend or indemnify BDC for Langley's negligence, the stipulated judgment was the only reasonable way for resolving this litigation.

### G.    MARKEL'S REFUSAL TO DEFEND TERRY DONNELLY AND BDC THREATENED THEM WITH INSOLVENCY

*Troyer* next inquires about "the insurance policy limits and solvency of the joint tortfeasors."  102 Haw. at 427.  BDC is a small, privately owned corporation without sufficient assets to discharge the likely verdict herein.  As we saw earlier, after Lexington paid Isham's entire $1,000,000 limit and $500,000 of Trout's, it insisted on withdrawing from the case.  That, in turn, left only Langley's professional liability carrier, Markel.  But Markel not only refused to negotiate, it refused to defend.  That refusal left BDC between a rock and a hard place.  Having the wherewithal neither to satisfy nor even defend the claims arising out of Langley's negligence, BDC had no practical option but to offer the Claypools judgment under Rule 68 and assign them an interest in its first party rights against Markel in return for a covenant not to execute.

### H.    FAR FROM COLLUDING WITH THE CLAYPOOLS    , BDC OPPOSED PLAINTIFFS' CLAIM WITH EVERY LEGAL TOOL AVAILABLE TO IT

*Troyer* also inquires into "the relationship among the parties and whether it is



conducive to collusion or wrongful conduct." 102 Haw. at 427. The Court will find

no hint of collusion or wrongful conduct here. As *Troyer* explains:

> '[T]he notion of collusion . . . implies something more than mere
> confederacy. Any negotiated settlement involves cooperation, but not
> necessarily collusion. It becomes collusive when it is aimed to injure
> the interests of an absent tortfeasor.'

*Id.* at 418.

Markel may argue that this settlement was somehow aimed at injuring

Langley's interests. But Langley was never really "absent" from this case. BDC not

only represented her interests vicariously throughout the litigation, it repeatedly

invited Markel to participate in the defense and help negotiate a global resolution.

If Markel declined those invitations, it has no one to blame but itself.

**I.    THERE IS NO EVIDENCE TO SUGGEST THAT THE RULE 68 JUDGMENT WAS OFFERED FOR ANY REASONS OTHER THAN PROTECTING BDC FROM THE EFFECTS OF MARKEĪS REFUSAL TO DEFEND OR INDEMNIFY WHILE AFFORDING THE CLAYPOOLS AN OPPORTUNITY TO OBTAIN FULL COMPENSATION**

*Troyer* finally invites consideration of "any other evidence that the settlement

is aimed at injuring the interests of a non-settling tortfeasor or motivated by other

wrongful purpose." 102 Haw. at 427. There is no such evidence here, and even if

there were, Markel estopped itself from complaining about this settlement when it

refused to defend BDC against the Claypools' claims.



[T]he insurer that refuses to defend does so at its own peril. For example, the insurer forfeits any right to control the defense costs and strategy, including the right to compel the insured's cooperation in the defense of the claims; if it loses its claim of no duty to defend, it will be obliged to reimburse the insured for all reasonable defense fees and costs properly incurred. See *Arenson v. National Auto. & Cas. Co.*, 48 Cal. 2d 528, 310 P.2d 961 (1957) (defaulting insurer liable for reasonable fees and costs properly incurred by insured in mounting constitutional challenge to statutory tort claim seeking $ 274.18 recovery despite insurer's objection to expense and vigor of defense). *Additionally, the breaching insurer waives its right to approve of any settlement*. See *Polaroid*, 414 Mass. at 765, 610 N.E.2d at 922. Under such circumstances, the insured is entitled to negotiate a reasonable and good faith settlement of the underlying claim which amount may then be utilized as presumptive evidence of the breaching insurer's liability. *Isaacson v. California Ins. Guar. Ass'n.*, 44 Cal. 3d 775, 791, 750 P.2d 297, 308, 244 Cal. Rptr. 655, 666 (1988). Thus, by refusing to provide a defense, the insurer risks liability for a settlement in an amount that, although reasonable, could be higher than it might have been able to secure. *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 765, 610 N.E.2d 912, 922 (1993). The same type of danger is inherent in a verdict rendered at trial.

In sum, fairness to both parties requires that the equities be balanced in each case. We, therefore, adopt the view of the Supreme Judicial Court of Massachusetts in *Polaroid* and hold that where the insured seeks indemnification after the insurer has breached its duty to defend, (1) coverage is rebuttably presumed, (2) the insurer bears the burden of proof to negate coverage, and (3) where relevant, the insurer carries its traditional burden of proof that an exclusionary clause applies. See *Polaroid*, 414 Mass. at 765 n.22, 610 N.E.2d at 922 n.22.

*Sentinel Ins. Co. v. First Ins. Co.*, 76 Haw. 277, 296-97 (1994).

## CONCLUSION

The settlement BDC and the Claypools put together under this Court's



supervision falls within the appropriate range for the facts of this case.  The Court

should therefore find that the stipulated judgment was offered and accepted in good

faith, just as it did for the parties in *Weber v. Pacific Indemnity Ins. Co.,* 345 F.Supp.

1139 (D.Haw., 2004).

Dated:   April 7, 2006                      LAW OFFICE OF HAROLD G. HOPPE
                                            McGUINN, HILLSMAN & PALEFSKY
                                            Attorneys for the CLAYPOOL Claimants


                                   By: _____
                                            JOHN R. HILLSMAN