```
                                                                1
 1                  UNITED STATES DISTRICT COURT
                         DISTRICT OF HAWAII
 2
    DENNIS CLAYPOOL, individually )Civil No. CV04 00570 ACK KSC
 3  and as Guardian Ad Litem for  )
    KRISTEN CLAYPOOL, a minor,    ) DEPOSITION OF
 4  SHERYL CLAYPOOL, SCOTT        ) TERRY DONNELLY
    CLAYPOOL, and KRISTEN CLAYPOOL) May 17, 2005
 5                                ) 8:50 a.m.
              Plaintiffs,         )
 6                                )
         vs.                      )
 7                                )
                                  )
    CAPTAIN ANDY'S SAILING, INC., )
 8  BLUE DOLPHIN CHARTERS, LTD.   )
    and BLUE DOLPHIN DIVING, INC.,)
 9                                )
              Defendants.         )
10  _____)
    MATTHEW ISHAM, individually   )Civil No. CV04-00559 ACK KSC
11  and as Guardian Ad Litem for  )
    HAYDEN ISHAM, a minor,        )
12  ROXANNE BEST ISHAM,           )
                                  )
13            Plaintiffs,         )
                                  )
14       vs.                      )
                                  )
15  BLUE DOLPHIN CHARTERS, LTD.   )
    and BLUE DOLPHIN DIVING, LTD.,)
16  CAPTAIN ANDY'S SAILING, INC., )
                                  )
17            Defendants.         )
                                  )
18  _____)
    In the Matter of              )Civil No. CV05-00017 HG LEK
    The Complaint of CAPTAIN      )
19  ANDY'S SAILING, INC., a Hawaii)
    corporation, as pro hac vice  )
20  owner, and EVANS PACIFIC, LTD,)
    a Hawaii corporation, as owner)
21  of M/V SPIRIT OF KAUAI, O.N.  )
    995776, for exoneration from  )
22  or limitation of liability.   )
                                  )
23  _____)
                         -continued-
24

25                     EXHIBIT    5

              PACIFIC REPORTING SERVICES UNLIMITED
                        (808) 524-PRSU
```

```
 1                          -continued-

 2  IN THE MATTER OF THE COMPLAINT) Civil No. CV05-00037 HG BMK
    OF THE BLUE DOLPHIN CHARTERS, )
 3  LTD. AND TERRY DONNELLY AS    )
    OWNERS OF THE VESSEL M/V BLUE )
 4  DOLPHIN, O/N 1082212, FOR     )
    EXONERATION FROM AND/OR       )
 5  LIMITATION OF LIABILITY.      )
    _____)
 6

 7


 8
                    DEPOSITION OF TERRY DONNELLY
 9
    Taken on behalf of Plaintiffs Dennis Claypool, individually
10  and as guardian ad litem for Kristen Claypool, a minor,
    Sheryl Claypool, Scott Claypool, and Kristen Claypool at
11  the American Savings Bank Tower, Suite 1901, 1001 Bishop
    Street, Honolulu, Hawaii, commencing at 8:50 a.m. on May
12  17, 2005, pursuant to Notice.
```

Transcribed by:   WILLIAM T. BARTON, RPR, CSR #391
                  Court Reporter, State of Hawaii

PACIFIC REPORTING SERVICES UNLIMITED
Suite 1470, Makai Tower
733 Bishop Street
Honolulu, Hawaii 96813
(808) 524-PRSU

1    A.    Yes.

2    Q.    And that she held a Certificate of Inspection

3 that was current back on July 20, 2004?

4    A.    Yes.

5    Q.    Did you need to have that Certificate of

6 Inspection in order to operate the Blue Dolphin as a vessel

7 to carry passengers for hire?

8    A.    Yes.

9    Q.    And did, indeed, you operate the Blue Dolphin

10 back on July 20, 2004 as a vessel that carried passengers

11 for hire?

12    A.    Yes.

13    Q.    Do you have an understanding as to how many

14 passengers the Blue Dolphin was licensed to carry?

15    A.    Yes.

16    Q.    What was that figure?

17    A.    The Blue Dolphin is required to have one master,

18 two deck hands.  It can have seven other persons or crew,

19 and 49 passengers.  Total 59 people are allowed on the

20 boat.

21    Q.    And on the day of the accident, am I correct in

22 stating that the Blue Dolphin was carrying four crew

23 members, that is a captain and three additional crew

24 members?

25    A.    Yes.

```
 1  BY MR. HILLSMAN:
 2      Q.   Can you do that for us, Terry?
 3      A.   Yes.
 4      Q.   Is that, indeed, the Blue Dolphin there in the
 5  foreground?
 6      A.   Yes.
 7      Q.   Who was in overall charge of the Blue Dolphin on
 8  July 20, 2004?
 9      A.   In what aspect of the trip?
10      Q.   After she was at Mokol'e.
11      A.   After she was at Mokol'e?
12           MS. BLACK:  Objection.  Vague and ambiguous.
13  BY MR. HILLSMAN:
14      Q.   If that question confuses you, Terry, let me
15  know.  I will be happy to rephrase it.
16      A.   No.  I'll try to answer.  When the boat parks at
17  Mokol'e's, the dive instructor person designated to take
18  care of the divers that day starts getting his divers
19  prepared to get into the water.
20           His responsibility goes to the divers.  We have a
21  safety officer on board, which that day which was Megan.
22  And we had Eric on board.  He was going to be the inwater
23  lifeguard safety officer type person.
24           All four people at that point work as a team, in
25  my mind, and the responsibility is to make sure the boat is
```

1  properly connected to the mooring, and that the boat is
2  ready to go for the inwater snorkeling, scuba diving,
3  swimming type thing.
4      Q.  Okay.  And I guess my question was:  Who is in
5  overall charge of that team?
6      A.  Well, the dive instructor's primarily in charge
7  of the diving, so he can decide if he wanted to dive or
8  not.
9          The boat captain is primarily in charge of
10 anchoring the boat.  Where do they anchor?  They talk
11 amongst themselves on that.  The captain can say, Let's
12 anchor here.  The dive instructor and the crew were in
13 charge of the snorkeling, as well.  They could say, No,
14 that's not a good place to snorkel.  Let's go somewhere
15 else.
16         They could say, We're going to snorkel dive here,
17 and the captain could say, No, it's not a safe place to
18 anchor.  They have to agree amongst themselves where to
19 moor the boat.  I try to spread the responsibility around.
20     Q.  I appreciate that.  But I am trying to figure out
21 whether the Blue Dolphin is being operated as a pure
22 democracy, or whether, indeed, somebody was in overall
23 charge of this team?
24         MS. BLACK:  Objection.  Vague and ambiguous as to
25 the word "team."

```
 1             MR. HILLSMAN:  It is.
 2   BY MR. HILLSMAN:
 3        Q.   Who was in charge of the Blue Dolphin?  Was it,
 4   indeed, a licensed master, David Lambdin?
 5        A.   Dave Lambdin was the master captain of the
 6   vessel.
 7        Q.   And as master captain of the vessel, he is,
 8   indeed, in overall charge of the vessel's operation, is he
 9   not?
10        A.   Yes.
11        Q.   He was ultimately responsible for the safety of
12   the vessel during the trip?
13        A.   Yes.
14        Q.   He was ultimately responsible for the safety of
15   all the passengers during the trip, was he not?
16        A.   During what aspects of it?  When the boat parks
17   and the people get in the water, I've got dive instructors
18   that are responsible, as well.
19             And, for instance, the scuba instructor is
20   ultimately responsible for the divers in the water, as well
21   as the lifeguard is responsible for the snorkelers in the
22   water.
23             And the safety officer is responsible for people
24   on the boat and snorkelers in the water and divers in the
25   water.  And boat captain, yes, is responsible in the
```

1  A. Yes.

2  Q. That is where you conduct the snorkeling part of
3  the tour?

4  A. Yes.

5  Q. Can you tell us from personal experience whether
6  the Lucky Lady's passengers typically scuba dive seaward of
7  the anchorage, as well?

8  A. Yes.

9  Q. Now, did any of your dive employees --
10     Do they, indeed, conduct scuba tours seaward of
11 the anchorage?

12 A. Who is "they"?

13 Q. The Lucky Lady, Kauai Sea Tours.

14 A. Yes.

15 Q. Did any of your dive employees ever tell you that
16 vessels, fishing boats and tour boats, sometimes motored
17 through their scuba site while there were divers in the
18 water? Prior to the accident, did anybody ever tell you
19 that?

20 A. I had heard, probably secondhand. I don't
21 specifically remember them telling me, but I heard through,
22 say, one my managers or word of mouth, if you will, that
23 somebody had gone over them.

24 Q. When did you first hear that?

25 A. I couldn't tell you.

```
 1      Q.   Was it prior to July 20, 2004?
 2      A.   Yes.
 3      Q.   Can you give us some estimate as to how long
 4 prior to July 20, 2004 you first learned that?
 5      A.   It happens not very often, but you will hear
 6 about it, and then we try to do something about it.
 7      Q.   From time to time, even prior to July 20, 2004,
 8 you learned that vessels, fishing boat or tour boats
 9 sometimes motored through your scuba diving site while
10 there were passengers in the water?
11      A.   Yes.
12      Q.   And did any of your employees, Mr. Isham,
13 Mr. Trout, Ms. Langley, ever tell you that vessels had
14 actually passed over their heads while they were scuba
15 diving at Mokol'e with passengers, prior to the accident?
16      A.   I don't recall that.  I've heard it in the
17 depositions, but I don't recall them specifically telling
18 me.
19      Q.   All right.  Is that potentially hazardous?  Does
20 it endanger your scuba diving employees and passengers to
21 have a vessel pass through the dive site over the heads of
22 the divers while they are in the water?
23      A.   Yes.
24      Q.   When you learned that that was happening prior to
25 the accident, did you do anything about it?
```

1  A.  Sure.

2  Q.  Did you make it clear to Matt Isham that there
3  should be a dive flag flying whenever divers were in the
4  water?

5  A.  Yes.

6  Q.  Prior to July 20, 2004?

7  A.  Yes.

8  Q.  Did you make it clear to Megan Langley that there
9  should be a dive flag flying whenever divers are in the
10 water at Mokol'e, prior to July 20, 2004?

11 A.  Yes.

12 Q.  Did you make it clear to Eric Trout that there
13 should a dive flag flying whenever divers were in the water
14 at Mokol'e, prior to July 20, 2004?

15 A.  Yes.

16 Q.  Did you also make it clear to each of those
17 individuals, prior to July 20, 2004, that there should be a
18 dive float in the water every single time that they were
19 allowed to dive at Mokol'e?

20 A.  Yes.

21 Q.  How long had Matt Isham worked for you, prior to
22 July 20, 2004?

23 A.  He had been with me more several years.  Like
24 three or four years.

25      I'm sure I could look at records.  I've seen the

1  a result of July 20, 2004 accident?

2      A.   No.

3      Q.   Do you have any criticism at all your employees'
4  performance on July 20, 2004?

5      A.   Well, sure I have some mild criticism.  I wished
6  it wouldn't have happened.  We always want to look at those
7  things and see what we could have done to avoid them.

8           Matt should have had a float in the water.  Megan
9  and Eric, both dive instructors, should have made sure Matt
10 had his float in the water.

11          On my water sport trips like that, my safety
12 officers and my lifeguards are always -- I like them to be
13 insured dive master instructor people, because I want that
14 extra expertise, as well as the insurance backup, to be
15 honest with you.

16          They knew he should have had the float in there.
17 They assisted him throughout those things.  They should
18 have had the float with him there.

19          As far as seeing a boat coming and trying to do
20 something about it, I wasn't there.  So I couldn't really
21 comment on that part of it.

22          But keep an eye out for everybody in the water.
23 Were my employees attentive enough?  I think they were
24 doing a good job, but they should is made sure Matt had his
25 buoy.  Eric could have paddled it over to him.  Megan could

1  have thrown it in the water. I wish they would have done
2  that.
3        Contact the Spirit of Kauai and tell them we have
4  divers in the area. Everybody knew we dived there. It
5  would be hard to pick on anybody for that.
6        But certainly, anything I could do to avoid the
7  situation like that again, I would do.
8        I think we had everything in place to prevent it.
9  Unfortunately, I think the balls fell in the wrong
10 direction, and it happened.
11    Q.   Terry, Megan Langley was the on-board safety
12 officer on July 20, 2004?
13    A.   She was.
14    Q.   What are her responsibilities?
15    A.   Her responsibilities are the -- the safety
16 officer position, I created a couple years ago. And it was
17 a result of an accident on the boat. A lady injured her
18 leg.
19        And one of the situations I saw there was the
20 crew member was actually telling the lady to sit down,
21 don't stand up, we're in some turbulent water. And she
22 kind of refused him and didn't do what she was told and
23 tried to walk around. Unfortunately, she hurt her leg.
24        I decided I needed a good cop, bad cop scenario.
25 I needed somebody that could walk up to that lady and say,

1  Ma'am, please sit down and stay seated, somebody that could
2  really -- they were busy trying to be nice to everybody.  I
3  needed somebody that would be an enforcer.
4       I established the safety officer position for
5  that very reason.  It's time to be the cop.  Tell this lady
6  to sit down.
7       And it carried on in every aspect of the safety.
8  On the water sport trips, I wanted somebody that I didn't
9  want just to be the captain, who is the master of the
10 vessel.  Somebody else needed to be there that was
11 responsible for the safety of people on the water sport
12 trips.
13      Everybody is in the water.  Who better but dive
14 instructors and dive masters?  They are people trained
15 certified and insured to take care of those sort of things.
16      The dive instructor --
17    Q.  Hang on.  Let's stay with my question for now.
18      My question, even more specifically, is:  What
19 were Megan's duties as safety officer while the vessel was
20 moored at Mokol'e with scuba divers in the water?
21    A.  As it related to the scuba divers, she was -- she
22 had responsibility for safety.  It's not uncommon, for
23 instance, when they start off the part of the diving,
24 either Megan or the lifeguard would assist the dive
25 instructor, would assist Matt in possibly watching the

1  people doing the open water skill training before they
2  start their Discover Scuba Diving.
3          And technically, by standards, there needs to be
4  somebody watching the other students while Matt or the dive
5  instructor was, working with everyone in the water.
6          Sometimes during a dive, a diver will, say, run
7  out of air or decide not to dive, and they come up to the
8  surface.
9          Megan would be looking for that. Say that
10 somebody popped up to the surface, and the dive instructor
11 didn't know it. Her job would be to spot it, as would
12 Eric. Both of them would keep an eye on everybody in the
13 water.
14         Let's say Matt brought somebody up to the
15 surface, said, This person is low, on air and sending them
16 back. He would pass them off to Megan. She's the on-board
17 safety officer. She's a certified instructor.
18         (Off the record discussion.)
19    A.   If Matt was to bring somebody up to the surface
20 because they were low on air or whatever, he could go back
21 down and join his group, to be able to pass that person off
22 to a certified instructor, to keep us within the standards.
23         Say, Here, Megan, take over this person. She now
24 has control over it. Watches the person swim back to the
25 boat. Matt goes back down and takes care of the other

1  divers.
2          She had a responsibility to keep an eye out for
3  snorkelers, as well, to make sure that they didn't wander
4  out of the zone.  We like to keep them together, for safety
5  reasons.
6          Specifically and as well as passenger safety in
7  general, while the boat is under way, she is the bad cop.
8  If we have somebody doing something unsafe, Megan will be
9  the one to can walk up and say, Hey, sit down, do this --
10     Q.   At these rates, we're trying to focus on her
11  responsibilities while the vessel is moored at Mokol'e.
12          Have you ever seen a vessel approach the
13  anchorage at Mokol'e from the inshore side of the anchorage?
14     A.   Once.  But I understand your question.  No,
15  that's very difficult.  We are so close to shore, they
16  shouldn't do that.
17     Q.   If vessels are going to be approaching Mokol'e,
18  they will typically do so from the area seaward of the
19  anchorage?
20     A.   Definitely.  They approach from seaward.
21     Q.   Can we also agree that at a minimum, one of
22  Megan's duties as on-board safety officer is to keep a
23  lookout to seaward of the anchorage over the dive area to
24  ensure that vessels don't approach that area and endanger
25  your divers?

1   A.   Yes.

2   Q.   If the evidence shows that Megan Langley did not
3   do that, and, indeed, if the evidence shows that Megan
4   Langley did not spot the Blue Dolphin -- pardon me -- did
5   not spot the Spirit of Kauai until after this accident, can
6   we agree that she did not perform that duty?

7       MS. BLACK:   Objection.   Calls for a legal
8   conclusion, incomplete hypothetical.

9   A.   Yes.

10  Q.   Now, Eric Trout is the lifeguard at Mokol'e on
11  the day of the accident.

12       What are his duties as lifeguard, relative to the
13  scuba divers?

14  A.   Very similar to Megan's.   He's just in the water.
15  I would say his duties would be very much the same in that
16  if he saw, he could observe them while skills training was
17  going on.   He could have also assisted them before they got
18  in the water.

19       If a diver came to the surface with Matt and he
20  wanted to send them back to the boat, Eric could have gone
21  to them and escorted them back to the boat, as opposed to
22  Megan watching them from the boat as they came back.

23       He could have, as a certified PADI instructor,
24  picked up the ratio, been within standards, and taken over
25  the diver.   He, too, could have seen anything that would be

```
 1  of a safety nature, you know, and alerted anybody about it.
 2              If he saw a whatever, the vessel, and saw it
 3  coming, he could have alerted Megan.  Megan, look,
 4  something is coming.
 5              His view would probably be more seaward,
 6  depending on who was looking.  He could have said, Megan,
 7  look.  He could have notified somebody as to a situation
 8  about to happen.
 9       Q.    Can we agree that Eric Trout was apparently the
10  crew member who first responded to the accident, by
11  paddling out to assist Mr. Claypool?
12       A.    That's my impression from what I've heard in
13  depositions and testimony and reports and everything.
14       Q.    Can we agree, once again, at a minimum, as the
15  inwater safety officer or the inwater lifeguard, Mr. Trout
16  should have positioned himself so that he could keep a
17  weather eye out to seaward, so that he could keep the
18  lookout out for vessels approaching the anchorage who might
19  transit through our dive area?
20       A.    Yes.
21       Q.    If the evidence shows that Mr. Trout did not spot
22  the Spirit of Kauai until after the accident, can we agree
23  that he, apparently, failed to discharge that duty?
24              MS. BLACK:  Objection.  Calls for a legal
25  conclusion.  Incomplete hypothetical.
```

```
 1                        CERTIFICATE

 2   STATE OF HAWAII      )

 3                        )  SS.

 4   COUNTY OF HONOLULU   )

 5       I, WILLIAM T. BARTON, RPR, Certified Shorthand

 6   Reporter, State of Hawaii, do hereby certify that on May

 7   17, 2005 at 8:50 a.m. there appeared before me TERRY

 8   DONNELLY, the witness whose deposition is contained herein;

 9   and that prior to being examined was duly sworn; that I am

10   neither counsel for any of the parties herein, nor

11   interested in any way in the outcome of this action;

12       That the deposition herein was by me taken down in

13   machine shorthand and thereafter reduced to print via

14   computer-aided transcription under my supervision; that the

15   foregoing represents a complete and accurate transcript of

16   the testimony of said witness to the best of my ability.

17       Dated this 19th day of May 2005 at Honolulu, Hawaii.

18

19   _____

20   WILLIAM T. BARTON, CSR No. 391

21   Notary Public, State of Hawaii

22   My Commission expires August 7, 2005

23

24

25
```